UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

LEONARD W. STRACK,                )
                                  )
        Plaintiff,                )
                                  )
        v.                        )    Case No. 1:10-CV-00240-JD-RBC
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social            )
Security,                         )
                                  )
        Defendant.                )

OPINION AND ORDER

On July 22, 2010, Plaintiff, Leonard W. Strack ("Strack"), filed his Complaint, seeking

review of the final decision of the Defendant, Commissioner of Social Security

("Commissioner"). [DE 1]. On January 6, 2011, Strack filed his opening brief. [DE 16]. On

March 14, 2011, the Commissioner filed a response in opposition. [DE 20]. No reply was filed.

The matter is ripe for ruling, with jurisdiction established under 42 U.S.C. § 405(g).

## I. PROCEDURAL HISTORY

On December 23, 2005, Strack filed an application for Supplemental Security Income

("SSI"), followed by an application for Disability Insurance Benefits ("DIB") on January 12,

2006, alleging disability beginning on December 31, 1980.[1] (Tr. 98). Strack later amended his

alleged onset date to August 31, 2005. (Tr. 29, 924). Strack's initial application was denied on

April 6, 2006, and was denied upon reconsideration on July 21, 2006. (Tr. 29, 82-89). Strack

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 401.1501 *et. seq.*,
while the SSI regulations are set forth at 20 C.F.R. § 416.901 *et. seq.* Because the definition of disability and the
applicable five-step process of evaluation are identical for both DIB and SSI in all respects relevant to this case,
reference will only be made to the regulations applicable to DIB for clarity.

requested a hearing before an Administrative Law Judge ("ALJ") which was held on July 24, 2008, before ALJ Terry Miller. (Tr. 915). Strack appeared with counsel at the hearing and testified on his own behalf. (Tr. 920-965). Vocational Expert ("VE") Charles McBee also testified at the hearing. (Tr. 965-970). On March 10, 2009, the ALJ issued his decision finding that Strack did have severe physical impairments, but had a sufficient residual functioning capacity ("RFC")[2] to perform several jobs within his community. (Tr. 29-40). Consequently, the ALJ found Strack was not disabled and was not entitled to SSI or DIB.

On May 29, 2010, the Appeals Council denied Strack's request for review, making the decision of the ALJ the final decision of the Social Security Administration. (Tr. 5). On July 22, 2010, Strack filed his Complaint in this Court, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) seeking review of the final decision of the Social Security Administration. [DE 1].

## II.  FACTS

Strack was fifty years old at the time the ALJ issued his decision. (Tr. 40, 98).  Strack attended Fort Wayne Community Schools ("FWCS") through the tenth grade. (Tr. 479, 922). There is no record of Strack's enrollment in any special education classes during his tenure at FWCS. (Tr. 479).  Strack later attempted to get his GED, but failed the test on "several" occasions, most recently in 2001. (Tr. 922).  Prior to the onset of his alleged disability, he had past relevant work as a tree cutter, a newspaper deliverer, a park caretaker, and an ice cream truck driver. (Tr. 38, 113, 233, 926).

---

[2] Residual Functioning Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting.  20 C.F.R.  § 404.1545(a)(1).

## A.  Medical Evidence

The record reveals that Strack had a number of severe physical impairments, which are not contested in this appeal.  To summarize, Strack has experienced chronic low back pain with symptoms radiating to the lower extremities (Tr. 31, 254-257, 342, 371-381, 414, 435, 435, 448), degenerative disk disease of the lumbar spine (Tr. 31, 373), vacuum disk phenomenon at L5-S1 (Tr. 373), and a bulging C4-C5 disk accompanied by pain and numbness.  (Tr. 411).  Strack has also been treated for bilateral foot injuries (Tr. 31, 335-337, 342, 379, 404- 410, 414, 455, 459, 532), a left calcaneal spur (Tr. 35, 531), bilateral knee pain (Tr. 498), gout, and gouty arthritis (Tr. 31, 550, 592).  Strack further suffers from gastroesophageal reflux disease ("GERD")  (Tr. 31, 317, 354, 416, 448), epigastric pain (Tr. 31, 236, 244, 265, 272-279, 291-298), type II diabetes[3] (Tr. 541), widening of the right superior mediastinum with large right hilar adenopathy (Tr. 311), granulomatous calcifications (Tr. 376), a badly healed scar in the right lower quadrant of his abdomen (Tr. 466), hemorrhoids (Tr. 317), obesity (Tr. 31, 369, 529), and a right shoulder injury (Tr. 31, 338).  Finally, Strack has been treated for hypertension (Tr. 31, 354, 414, 450), hyperlipidemia (Tr. 31, 414), chest pain (Tr.432), recurrent syncope (Tr. 31, 416, 495-496), headaches, dizziness, and a history of passing out (Tr. 31, 262, 414, 555).  An EKG performed on January 13, 2006 revealed left ventricular hypertrophy, right ventricular dilation, moderate tricuspid regurgitation, and mild mitral regurgitation.  (Tr. 35, 631).  However, a subsequent EEG performed in July 24, 2006 came back normal with no sign of these conditions.  (Tr. 35, 635).  Additionally, Strack suffers from several mental impairments including: low IQ scores in the 60 to 70 range, dysthymic disorder (Tr. 31), insomnia (Tr. 493), and adjustment disorder with mixed anxiety and depressed mood (Tr. 31, 342).

---

[3] On May 14, 2009, Dr. Wing Sue Shiu, DPM, a podiatrist, indicated that the diagnosis of diabetes was an error.

*1. Medical Evidence from 2005*

On September 12, 2005, Strack visited the emergency room because he was experiencing chest pains. (Tr. 430-433). He told staff nurse Gaye Potts that he was not in pain currently, but had been experiencing intermittent pain for the past week. (Tr. 431). He also indicated that he had passed out two and a half weeks earlier after delivering newspapers outside. (Tr. 432). Nurse Practitioner Hellen Rossman ultimately released Strack from the emergency room with no changes to his previous plan of care. (Tr. 433).

On September 22, 2005, Strack had a CT scan and several x-rays taken as a result of a motor vehicle accident that took place the day before. (Tr. 371-376, 425-429). The CT scan showed no mass effect or hemorrhage. (Tr. 371). The x-rays of Strack's hips, spine thoracic, and cervical spine were normal and showed no fractures. (Tr. 372, 374). The spine lumbosacral x-ray showed no fractures and normal spinal alignment, but noted vacuum disk phenomenon and degenerative disk disease at LF-S1. (Tr. 373). Chest x-rays showed the heart and pulmonary vascularity were normal and Strack's lungs were clear, but noted old granulomatous calcifications (Tr. 375-376).

On September 29, 2005, Strack was evaluated for Post-traumatic Stress Disorder ("PTSD"). (Tr. 398-400). The social worker who evaluated him, Rita Wynn, deferred diagnosis of PTSD, but scheduled a follow-up appointment for a later date. (Tr. 400). Wynn noted Strack was alert and oriented, and had no problems with concentration or memory; but was concerned with his physical ailments, especially headaches and "blackouts." (Tr. 399).

On October 26, 2005, Strack underwent a comprehensive psychiatric evaluation in order to determine if he suffered from PTSD. (Tr. 419-422). He was evaluated by Justin Boyce, Ph.D., a Social Sciences Program Specialist and Donald Wilson, Ph.D., a Psychologist. (Tr.

422). Strack was found to be alert and oriented and functioning with "at least average" intellect. (Tr. 421). Strack was not diagnosed with PTSD because there was "no evidence" of the disorder. (Tr. 422). Strack was assigned a Global Assessment of Functioning ("GAF") score of 60.[4] (Tr. 422).

On November 30, 2005, Strack was assessed by the Park Center, Inc. (Tr. 340-351). Dottie Fuentes, CMHP evaluated Strack and ultimately diagnosed him with Adjustment Disorder with Mixed Anxiety and Depressed Mood, back and foot pain (based on Strack's self report), and the following psychosocial stressors: financial problems, marital problems, difficulties accessing appropriate health care. (Tr. 342). She determined that his GAF score was 65. (Tr. 342). She noted his intellectual functioning may interfere with treatment, and that Strack had minimal insight, but that he was oriented, very cooperative and his thinking form was very concrete. (Tr. 341).

On December 15, 2005, Strack spoke with a staff nurse, Barbara Miller, on the telephone regarding his episodes of passing out. (Tr. 418-419). He was offered an appointment in early January, but requested an earlier appointment in order to be fully evaluated. (Tr. 419). Ms. Miller advised Strack to visit the ER if he needed to be evaluated right away, which Strack refused to do. (Tr. 419). Ms. Miller noted that prior to her telephone conversation with Strack,

_____

[4] A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS-Text Revision 32 (4th ed. 2000). The higher the GAF score, the better the individual's level of functioning. A GAF score of 51-60 indicates moderate symptoms, such as flat affect and circumstantial speech, occasional panic attacks, or moderate difficulty in social, occupational, or school functioning. A GAF score of 61-70 indicates some mild symptoms or some difficulty in social occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. A GAF score of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressors, and no more than slight impairment in social, occupational, or school functioning.

Strack had been a "no show" for three other appointments which were scheduled to follow up on his claimed episodes of passing out. (Tr. 418-419).

On December 16, 2005, Strack was seen by Dr. Ashish Khemka for evaluation of his hypertension, hyperlipidemia, back pain, foot pain, and his episodes of passing out. (Tr. 414-418). Dr. Khemka diagnosed him with essential hypertension, mild hyperlipidemia, GERD, and low back pain due to mild degenerative disk disease. (Tr. 416). Dr. Khemka noted that Strack had been to the ER due to his frequent episodes of passing out, but that the doctors could not find the reason for these episodes. (Tr. 415). Strack told Dr. Khemka that he had passed out three times, and that there were witnesses to the episodes. (Tr. 415). However, Dr. Khemka noted that these witnesses never accompanied Strack to the ER, and he always came to the ER alone. (Tr. 415). Dr. Khemka told Strack that if he had any further episodes, he should bring any witnesses to the ER with him so they could determine what exactly was happening.[5] (Tr. 416).

*2. Medical Evidence from 2006*

On January 10, 2006, Strack underwent a functional capacity evaluation given by physical therapist Phillip Galeon. (Tr. 392-393). Mr. Galeon determined that Strack was unable to perform activities that involve kneeling or squatting, such as picking up boxes from the floor. (Tr. 393). However, during an eight hour work day, Strack could sit, stand, and walk for twenty minutes at a time; bend/stoop occasionally; crawl occasionally; climb stairs frequently; reach occasionally; balance frequently, push/pull frequently; and lift/carry 10-15 pounds occasionally. (Tr. 393). Further, Strack could use his feet and hands in repetitive motions. (Tr. 393).

---

[5] Following this advice from Dr. Khemka, Strack visited the ER alone on June 28, 2006. (Tr. 497). Licensed Practical Nurse Cindy L. Rodriguez noted in the file that Strack indicated that a friend had witnessed a passing out episode and told him it looked like a seizure. (Tr. 497). Again, the witness did not accompany Strack to the emergency room. (Tr. 497). The record contains letters written by two people who witnessed Strack pass out. (Tr. 906-908). However, there is nothing in the record to indicate that either of these witnesses ever accompanied Strack to the ER or a doctor's appointment to assist in determining the cause of Strack's problem.

On March 1, 2006, Strack underwent a psychological evaluation conducted by Clinical Psychologist Wayne J. Von Bargen, Ph.D. (Tr. 480-485). Dr. Von Bargen administered the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III"), in which Strack achieved a verbal scale IQ score of 71, a performance scale IQ score of 69, and a full-scale IQ score of 67, which falls within the mild mental retardation range. (Tr. 481). Dr. Von Bargen found the content of Strack's verbalizations logical, relevant and coherent. (Tr. 480). He noted that during the testing, Strack "understood instructions readily," but worked slowly, "occasionally correctly completing tasks after allotted time limits had elapsed." (Tr. 480). Dr. Von Bargen also noted that in several parts of the test, Strack correctly completed difficult parts of the test after failing easier items. (Tr. 481). He wrote, "Since test items are generally arranged in order of increasing difficulty, it may be presumed that he should have been able to correctly perform some of the easier tasks, thus his resulting scores may be a slight underestimate of his actual ability." (Tr. 481). Dr. Von Bargen acknowledged that Strack's IQ scores were within the range of mental retardation, but declined to diagnose him as mentally retarded. (Tr. 481-482) Instead, Dr. Von Bargen diagnosed Strack with Borderline Intellectual Functioning ("BIF"), because it was "likely to be a more appropriate classification of intellectual ability." (Tr. 482). Dr. Von Bargen also diagnosed Strack with Dysthymic Disorder and assigned a GAF score of 60. (Tr. 482). Dr. Von Bargen indicated that Strack was able to "adequately care for himself and perform routine daily activities." (Tr. 482). Further, Dr. Von Bargen explained that: "Individuals of similar intellectual ability perform best in unskilled or semiskilled occupations, involving relatively repetitive tasks. Some supervision is usually necessary, but independent job functioning is possible. [Strack's] cognitive functioning appears to be intact, and he is capable of managing his own funds." (Tr. 482).

On March 2, 2006, Dr. H.M. Bacchus, Jr., M.D. gave Strack a physical examination. (Tr. 486-488). His final impressions were: 1) a history of learning disability; 2) history of right shoulder, back, and bilateral feet injuries with chronic pain; 3) possible history of gout; 4) depression by history; 5) poor social skills by history; 6) hypertension under fair control; and 7) GERD treated with medication. (Tr. 487). Dr. Bacchus noted: "Claimant appears to retain the functional capacity to perform general, simplified duties, standing 5-6 hours in an 8 hour day. He may function better with limited social interaction." (Tr. 487).

On March 3, 2006, Kenneth Neville, Ph.D. (Tr. 41) reviewed Strack's file and Dr. Von Bargen's diagnosis. (Tr. 508-525). Dr. Neville indicated that there were diagnoses under categories 12.02 Organic Mental Disorders (BIF) and 12.04 Affective Disorders (Dysthymia Disorder), but indicated that an RFC assessment was necessary because the diagnoses did not meet the listing requirements. (Tr. 508). Dr. Neville made no diagnosis under 12.05 Mental Retardation. (Tr. 512). Relative to Strack's functional limitations, Dr. Neville found that Strack was only mildly limited in the activities of daily living and maintaining social functioning, moderately limited in maintaining concentration, persistence, or pace, and that Strack had not experienced any episodes of extended decompensation. (Tr. 518). Further, the evidence did not establish the presence of "C" criteria. (Tr. 518).

Dr. Neville also completed a Mental RFC Assessment. (Tr. 522-525). Relative to Strack's understanding and memory, Dr. Neville determined that Strack was not significantly limited in his ability to remember locations and work-like procedures, or his ability to understand and remember very short and simple instructions, but he was moderately limited in his ability to understand and remember detailed instructions. (Tr. 522). Relative to concentration and persistence, Strack was not significantly limited in any of the following: his ability to carry out

very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; and make simple work-related decisions. (Tr. 522). Strack was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 522-523). Relative to Strack's ability to interact socially, Dr. Neville indicated that Strack was not significantly limited in any of the following: his ability to interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 523). Strack was moderately limited in his ability to respond appropriately to changes in the work setting, but was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, or set realistic goals or make plans independently of others. (Tr. 523).

Ultimately, Dr. Neville acknowledged Strack's low IQ scores, but concurred with Dr. Von Bargen's diagnosis of BIF because it "fit with history and adaptive behavior." (Tr. 524). Dr. Neville also wrote that Strack "is able to perform a wide range of tasks without difficulty . . . can cooperate and tolerate the casual interactions necessary to perform tasks . . . appears to have the cognitive abilities and concentration necessary to complete tasks. [He] can make work related decisions, remember location and remember work like procedures." (Tr. 524). Dr. Neville

concluded that Strack had the capacity to carry out simple repetitive tasks in a competitive setting. (Tr. 524).

On April 4, 2006, Dr. J. Sands, M.D. reviewed Strack's file. (Tr. 507). He determined that a review of the evidence showed that Strack did not have a severe impairment. (Tr. 507).

On June 8, 2006, Strack saw Dr. Khemka for evaluation and management of his hypertension, hyperlipidemia, low back pain, foot pain, and shoulder pain. (Tr. 497-499). Strack indicated that he continued to have episodes of passing out, and was dealing with anxiety and depression, and that he thought he had PTSD. (Tr. 498). Dr. Khemka determined that Strack's hypertension was under control with medication, and that he had low pack pain secondary to mild degenerative disk disease, hyperlipidemia, GERD, and depression with PTSD. (Tr. 499) He referred Strack for another PTSD screening. (Tr. 499). Dr. Wilson declined to do another PTSD screening since the last one was completed within a year. (Tr. 499). He also noted that Strack had never followed up with scheduling additional psychological testing. (Tr. 499).

On July 20, 2006, Dr. Von Bargen saw Strack again. (Tr. 504-505). Dr. Von Bargen did not repeat the cognitive functioning screening, since it was completed so recently. (Tr. 505). Dr. Von Bargen's diagnosis changed only to add a History of Alcohol Dependence, based on Strack's self report. (Tr. 505). The diagnosis of BIF remained the same, as did Strack's GAF score of 60. (Tr. 505).

Also on July 20, 2006, Dr. M. Brill, M.D. reviewed the evidence in the file. (Tr. 506). He affirmed Dr. Sands' assessment dated April 4, 2006, and indicated that Strack did not have a severe impairment. (Tr. 506). So too, Dr. Kladder reviewed the file and affirmed the March 2006 assessment conducted by Dr. Neville. (Tr. 526).

On July 24, 2006, Strack was seen at a mental health clinic by Dr. Manoj Suryawala, M.D., a psychiatrist, who made a provisional diagnosis of Adjustment Disorder and assigned Strack a GAF of 75. Then, on July 28, 2006, Strack had a comprehensive psychiatric evaluation completed by Dr. Bruce E. Nerenberg, Ph.D., a psychologist. (Tr. 616-620). Dr. Nerenberg found Strack to be "alert and oriented to person, place, time and situation." (Tr. 619). Strack's intellect was "at least average," and "his concentration and attention was good; his memory is also well within normal limits. He is rather concrete in much of his thinking." (Tr. 619). Dr. Nerenberg concluded that Strack suffered from Adjustment Disorder with depressed mood, personality traits, and financial difficulties. (Tr. 620). Dr. Nerenberg determined Strack's GAF score to be 62. (Tr. 620).

On August 31, 2006, Strack complained of his passing out "spells," but his "examination was grossly normal." (Tr. 567). On September 11, 2006, Strack had a brain MRI which revealed a mild generalized cerebral atrophy, with no intracranial mass lesions. (Tr. 634).

On September 28, 2006, Strack underwent a Myocardial Stress & Redistribution Scan. (Tr. 532-533). The scan showed "fixed interior perfusion defect most consistent with a diaphragmatic attenuation artifact. No scintigraphic evidence of dipyridamole induced reversible perfusion abnormalities." (Tr. 533). Strack also completed an Adenosine Cardiolite stress test on this date. (Tr. 563-564). Strack experienced no chest pain or premature ventricular contraction, although he complained of a headache. (Tr. 564). His resting blood pressure was elevated, but the response was appropriate. (Tr. 564). The resting electrocardiogram was within normal limits. There was no ST segment depression noted during the stress test. (Tr. 564).

On October 12, 2006, Strack had a neurology consultation with Dr. Edward D. Zdobylak, M.D. (Tr. 608). This examination was "grossly normal." (Tr. 608). Dr. Zdobylak noted that

both the cardiac and neurological work-ups were "essentially unremarkable." (Tr. 608). As he was unable to locate the cause of Strack's passing out episodes, Dr. Zdobylak referred him to the Ear, Nose, and Throat ("ENT") clinic and Neuro-ophthalmology, hoping the cause of his symptoms would be discovered there. (Tr. 608).

On November 16, 2006, foot and ankle x-rays were taken. (Tr. 531-532). The ankle X-rays showed joint effusion, soft tissue swelling, and a calcaneal spur, indicating osteoarthritis and joint effusion. (Tr. 531). The foot x-rays indicated minimal degenerative changes at the talonavicular and ankle joints and soft tissue swelling in the forefoot (Tr. 532).

*3. Medical Evidence from 2007*

On January 2, 2007, Strack saw Dr. Khemka for a six month check up. (Tr. 590-592). Strack's main complaint was his lower back pain along with his "spells." (Tr. 591). Dr. Khemka acknowledged that the work ups completed by the cardiologist and neurologist were both negative. (Tr. 591). Strack was scheduled to see an ENT doctor later in the month. (Tr. 591). Dr. Khemka made no new diagnosis. (Tr. 592).

On January 30, 2007, Strack was seen by Dr. Shiu, who diagnosed Strack with gouty arthritis and indicated that he may benefit from shoe modifications. (Tr. 552).

On April 18, 2007, Strack saw an otolaryngologist for his passing out episodes. (Tr. 555-556). Strack again indicated that the passing out always happens during the summer, and he believed it to be because he was taking diuretics for hypertension. (Tr. 555). The conclusion was that the passing out was not likely due to any problems with his inner ears. (Tr. 555). The physician ordered some follow up, but indicated his symptoms may have been related to migraines, hypertension, or medications. (Tr. 555).

On June 20, 2007, Strack saw his primary care physician, Dr. Khemka for a check up. (Tr. 581-586). Strack complained of lower back pain, and Dr. Khemka increased his pain medication in response. (Tr. 581). Dr. Khemka indicated that at this appointment, Strack's blood pressure was under control. (Tr. 582). Dr. Khemka made no new diagnosis at this appointment (Tr. 582). On June 28, 2007, Strack had a follow-up appointment on his shoes and it was noted that Strack "walks everywhere" and new shoes were ordered because he cracked them. (Tr. 580).

On August 21, 2007, Strack had a second neurology consultation with Dr. Zdobylak regarding his headaches and episodes of passing out. (Tr. 544-545). Dr. Zdobylak noted that neither the ENT nor the neuro-ophthalmological exams determined the reason for Strack's episodes. (Tr. 545). Strack indicated to Dr. Zdobylak that heat exposure and diuretics were causing his "spells," and that was the reason he quit working for the tree service and quit his paper route. (Tr. 545). Since Strack's full work up for other causes did not indicate any other possibility, Dr. Zdobylak agreed with Strack that the passing out was "likely related to diuretic use in the hot sun as they seem to occur always when he is in hot, humid conditions." (Tr. 545).

On November 8, 2007, Strack was seen by Dr. Richard Goldburg, an ENT doctor for an otolaryngology consultation. (Tr. 577-578). Dr. Goldburg did not do any additional examination, but reviewed Strack's medical records and suggested he have a glucose tolerance test completed. (Tr. 577). Dr. Goldburg noted, without any explanation, that Strack was disabled. (Tr. 578).

*4. Medical Evidence from 2008*

On January 10, 2008, Strack visited Dr. Khemka for a six month check up. (Tr. 572-573). During the appointment, Strack indicated that he still had pain in his lower back and

extremities, but indicated that his blood pressure had been under control and he had not passed out in the last year. (Tr. 572).

On February 15, 2008, Jayme Frakes from the Disability Determination Services reviewed the file and determined that the evidence supported the previous mental and physical diagnoses. (Tr. 527).

On June 10, 2008, Strack saw Dr. Suseela Doravari for his six month check up. (Tr. 740-744). He told Dr. Doravari that he was still experiencing chronic back and leg pain. (Tr. 740). He complained of shortness of breath unrelated to physical activity. (Tr. 740). Dr. Doravari thought this could be panic attacks, and advised Strack to keep his appointment at the mental health clinic. (Tr. 741). Strack did not complain of experiencing episodes of passing out. (Tr. 740-744).

On June 12, 2008, Strack underwent another comprehensive psychiatric evaluation, completed by Carolyn Richeson, a clinical social worker. (Tr. 737-740). According to Ms. Richeson, Strack was "oriented on all spheres," his thought processes were logical, he was cooperative, but his mood was dysphoric. (Tr. 739). Ms. Richeson stated that "most likely [Strack's] intellect is within the average range." (Tr. 739). Ultimately, Ms. Richeson diagnosed Strack with Adjustment Disorder with depressed mood. (Tr. 739).

On June 13, 2008, Strack saw Dr. Suryawala in the mental health clinic. (Tr. 736-737). Dr. Suryawala confirmed Strack's diagnosis of Adjustment Disorder with depression and assigned Strack a GAF score of 65. (Tr. 736). He prescribed Strack an anti-depressant. (Tr. 736). Dr. Suryawala noted that Strack was "still fighting with Social Security and cannot work because of his back problems." (Tr. 736).

On July 23, 2008, Strack underwent a colonoscopy to try to determine the cause of his stomach problems. (Tr. 821-832). As of the hearing on July 24, 2008, he had not received the results of the procedure. (Tr. 948-949).

## B.    Hearing Evidence

### 1. Strack's Testimony

Strack appeared with counsel at the hearing and testified on his own behalf. (Tr. 920-965). Strack testified that he was fifty years old, married with one child, and currently buying a home from his brother. (Tr. 920-921). He testified that his wife generates all of the household income through her daycare. (Tr. 921). He also indicated that he had a driver's license and was able to drive, but his wife drove him to the hearing due to the level of pain that he was experiencing. (Tr. 921-922). Strack testified that he had tried to get his GED several times, but had difficulties due to his poor reading and writing skills. (Tr. 922-923). He also had difficulty with math, other than completing addition and subtraction. (Tr. 923).

Strack then told the ALJ about his job with Fort Wayne Newspapers, which he held directly before his amended onset date. (Tr. 924-926). He stated that it was a full-time position and that he worked eight to ten hours a day, delivering papers on four routes. (Tr. 924). He also stated that during the course of his workday he walked almost forty miles a day. (Tr. 926). Strack indicated that he quit his job delivering newspapers because he was passing out and experiencing back and foot pain. (Tr. 926).

Relative to his physical conditions, Strack testified that he had broken both feet, had arthritic gout in both feet, and had arthritis in his back. (Tr. 927). He also stated that he had ongoing stomach problems, high blood pressure, and a history of passing out. (Tr. 928). He

stated that he could remember passing out ten times.  (Tr. 928).  He also indicated that he had a problem with severe headaches, dizziness, depression and mood swings.  (Tr. 929).

The ALJ asked Strack to identify his "major primary problem", and Strack stated that it was his back problem and his problem with passing out.  (Tr. 929).  Relative to his back pain, Strack testified that he was in excruciating pain in the mornings, which got a little better with pain medication, but then returned in the evening.  (Tr. 929-930).  The pain was located in his lower back, and his pain level averaged an eight or eight and a half out of ten every day.  (Tr. 930).  The pain was worse when he tried to lift anything or walk up and down stairs.  (Tr. 930-931).  Strack also stated that he took Hydrocodone for the pain, which gets so bad sometimes he has to lie down all day.  (Tr. 931-932

Strack also described his foot pain.  (Tr. 933-935).  He testified that his feet would swell, turn purple, and ache so bad that he could barely walk on them.  (Tr. 933).  He stated that his feet are red and hurt every day and that they turn purple "every once in awhile."  (Tr. 934).  He took gout medication, which helped.  (Tr. 934).  He was also given orthopedic shoes to help him stand and walk, but he testified that he could still only walk a block because of the pain.  (Tr. 934-935). He also testified that the Hydrocodone prescribed for his back pain did not help the pain in his feet.  (Tr. 935).

When describing his dizziness and headaches, Strack testified that the dizziness was related to the "excruciating" headaches he has every day. (Tr. 935).  Strack stated that he did not know what caused the headaches, but that his head would just start hurting and he would get dizzy.  (Tr. 936).  Strack indicated that he did not take any additional pain medication to deal with the headaches, but that he would go to his bedroom and lie down.  (Tr. 936).  He also stated that bright lights and loud noises bother him when he had a headache (Tr. 936).  Strack testified

16

that the pain would last for three or four hours and would fade out, but never completely go away.  (Tr. 937).  He also indicated that he had experienced these symptoms for three to four years.  (Tr. 937).

Next, Strack described his stomach problems, which he has experienced for 30 years. (Tr. 937-938).  Strack indicated that stomach medication did not help.  (Tr. 937).  Strack reported that he had a colonoscopy the day before the hearing in an attempt to discover the cause of his stomach pain.  (Tr. 948-949).

As to his high blood pressure, Strack testified that he was taking water pills for his high blood pressure during the entire time that he worked the newspaper route.  (Tr. 938).  He found out in October 2005 that he was not supposed to take that particular pill if he was exposed to the sun for prolonged periods of time.  (Tr. 939).  Strack stated that he thought that his passing out was due in part to taking this pill while he was delivering newspapers during the day.  (Tr. 938). He indicated that even though his doctors had changed his blood pressure medication, he still got dizzy and felt like he was going to pass out every day.  (Tr. 939).  He also stated that at his last appointment his blood pressure had gone back to being high.  (Tr. 939).

When the ALJ inquired about his ability to perform specific physical activities, Strack stated that he could walk half a block before he would have to stop, and that he could never go back to walking after resting.  (Tr. 941-942).  He stated that his daily walking was limited to walking to his vehicle and to taking his dog out in the back yard.  (Tr. 942).  Strack testified that he could stand for five to ten minutes before he had to sit in order to avoid feeling dizzy and passing out, and that he used a cane to assist him in standing and walking.  (Tr. 943).  Strack testified that he could sit for ten to fifteen minutes before he needed to get up and move around. (Tr. 944).  During Strack's testimony, he stood up due to the discomfort he experienced while

sitting. (Tr. 926, 946). Strack also stated that his doctors told him that he could lift up to ten pounds, but that sometimes he could not lift as much as a gallon of milk. (Tr. 944). He indicated that when he tried to lift too much, he had pain in his back and his shoulder. (Tr. 944). Strack stated that he did not have a tight grip anymore, most likely because of his arthritis, and that he could not bend, stoop, or squat at all because he would pass out if he did, and that his wife or his son tied his shoes for him. (Tr. 945). Strack indicated that he climbed the stairs in his home three or four times daily. (Tr. 945).

Strack indicated that he also had problems at night. (Tr. 945-946). He stated that he had to use the restroom "all the time," and woke up every twenty minutes. (Tr. 946). He indicated that he had experienced these problems for the last twenty years, but that he had not addressed it with his VA doctors. (Tr. 946). He also testified that he woke up with a severe sore throat two to three times per week for the last three or four years. (Tr. 960). He testified that his doctors thought he was having panic attacks, but to Strack it felt like he was "dying." (Tr. 949-960).

Considering his mental condition, Strack testified that he was depressed about his situation and not being able to help his family. (Tr. 946). He said he sometimes has mood swings and is stressed out by his level of pain. (Tr. 946). Strack also stated that he had memory problems, and that he could not complete tasks like washing the dishes. (Tr. 947). Strack then testified that he had started taking antidepressant medication in June 2008, but he did not know if the medication had helped, but it seemed to help him relax. (Tr. 949). Strack indicated that he had difficulty being around the twelve children his wife cared for on a daily basis, and that he spent as much time as he could away from them. (Tr. 950). He also had a difficult time being around large groups of adults. (Tr. 950). He indicated that he and his wife see her family on a regular basis, but not his family. (Tr. 951). He said he had a few friends, but that he did not see

18

them on a regular basis. (Tr. 951). He testified that he did not smoke, and last drank ten years ago because of a previous problem with alcohol abuse. (Tr. 951-952).

When asked to describe a typical day, Strack testified that he normally woke up around 5:30 or 6:00 in the morning, and then if he felt good enough, he performed his personal hygiene, and then went and sat on the couch for about an hour, until he had to get up and move around. (Tr. 953). Strack indicated that around 9:30 or 10:00 he went upstairs and took a two hour nap. (Tr. 953). He then spent time with his wife while the children were napping. (Tr. 954). In the afternoon, he laid down again until 3:00. (Tr. 954). After that, he either went downstairs again or watched the television in his bedroom. (Tr. 954). He indicated that he normally bathed at night. (Tr. 953).

Strack did not read, mostly because of his poor reading skills, but he occasionally looked at the sports section of the newspaper. (Tr. 954-955). Strack testified that he enjoyed watching baseball on television, but had some trouble concentrating on the game and could not sit to watch an entire game because of his pain. (Tr. 955). He also stated that he did not use the computer or telephone in his home. (Tr. 956).

Next, Strack testified that he had difficulty bathing because of his back pain. (Tr. 957). He stated that he did not cook much, and sometimes accompanied his wife to the grocery store, but usually waited in the car. (Tr. 957). Strack testified that he attempted to wash the dishes about once a month, but that he did not do them very well. (Tr. 957). He made his bed occasionally, but did not help with any other household chores. (Tr. 957-958). Strack stated that his wife usually mowed their lawn, but that he sometimes tried to do it. (Tr. 958). He testified that he is unable to help his son with his homework, but that he watched his son's baseball games. (Tr. 958). Strack stated that he attended church every week, but he had a difficult time

sitting through an entire service.  (Tr. 959).  Strack also testified that he left the Catholic faith and became a Lutheran so that he did not have to kneel as often in church.  (Tr. 961).  Strack testified that he drove occasionally, but no more than a mile at a time.  (Tr. 959, 962).

Strack also confirmed that he experiences bad nightmares.  (Tr. 963).  And other than watching television and watching his son play baseball, Strack indicated that he had no other hobbies.  (Tr. 960).

*2. Vocational Expert's Testimony*

The ALJ posed a hypothetical to the VE which was consistent with the ALJ's RFC assessment and referenced Strack's physical, intellectual, and emotional impairments. Specifically, the hypothetical involved an individual of Strack's age, education, and work experience who could perform a range of light, unskilled work involving only simple, routine repetitive tasks with the additional limitations of a sit-stand option; only occasional climbing ramps or stairs, stooping, kneeling, balancing, crouching; no climbing ladders, ropes, or scaffolds; no concentrated exposure to extreme heat or humidity; no work at unprotected heights or dangerous moving machinery; no exposure to bright lights or loud noise; no fast pace or strict production requirements; and nothing where reading, writing, or math is an essential part of the job.  (Tr. 966-967).  The VE testified that such an individual could not perform Strack's past relevant work, but could perform other jobs in the community including: bagger of garments, folder of laundry, and inspector, hand packager.  (Tr. 967).  The ALJ then posed a hypothetical with the same limitations as the first, but with the work level reduced from light to sedentary. (Tr. 968).  The VE testified that an individual under those circumstances could also perform jobs in the community including: hand mounter, table worker, and waxer.  (Tr. 968).  If one were to assume that Strack's testimony was totally credible and was supported by the medical evidence,

the VE testified that based on the combinations of Strack's conditions, he would not be able to perform any of the jobs available in the community. (Tr. 969).

## C.    The ALJ's Decision

The ALJ made the following findings of fact: There was insufficient evidence to determine if Strack had engaged in any substantial gainful activity since his amended alleged onset date of August 31, 2005. (Tr. 31). Strack had the following severe impairments: chronic low back pain due to degenerative disc disease of the lumbar spine, a history of bilateral foot injuries, a history of right shoulder injury, reported headaches, gout, a history of GERD/epigastric pain, a history of hypertension and hyperlipidemia, a history of recurrent syncope/passing out episodes and dizziness, obesity, systhymic disorder/adjustment disorder with mixed anxiety and depressed mood, possible PTSD, and BIF. (Tr. 31). However, he did not have an impairment or combination of impairments that met one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 32).

Strack had RFC to perform light work, with the following limitations: a sit/stand option where he could occasionally change positions throughout the day; he could only occasionally climb ramps and stairs, stoop, kneel, balance, and crouch, but unable to climb ladders, ropes, or scaffolds at all; and could not work in an environment where he would be exposed to bright lights or loud noises, or where he would be exposed to extreme heat or humidity. (Tr. 32). Strack was further limited to simple, routine, repetitive tasks not involving fast pace or strict production requirements, and could not complete tasks where reading, spelling, and math were essential elements of the job. (Tr. 32).

Strack had a limited education, and on the amended disability onset date, Strack was considered a younger individual, but at the time of the ALJ's decision, his age category changed

21

to 'closely approaching advanced age.'  (Tr. 38).  The ALJ found that transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding of "not disabled," whether or not Strack had transferable job skills.  (Tr. 38).

Based on Strack's RFC restrictions, the ALJ determined that Strack was unable to perform any of his past relevant work.  (Tr. 38).  However, considering his age, education, work experience, and RFC finding, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Strack could perform.  (Tr. 38).  Consequently, the ALJ found that Strack was not disabled and was not entitled to social security or disability benefits.  (Tr. 40).

## III.  STANDARD OF REVIEW

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, the district court will affirm the Commissioner's finding of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or

substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.* Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. ANALYSIS

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  At step three, if the ALJ determines

that the claimant's impairment or combination of impairments meets or equals an impairment

listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. §

404.1520(a)(4)(iii).  However, if a listing is not met or equaled, in between steps three and four,

the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the

claimant can perform his past work under step four and whether the claimant can perform other

work in society at step five of the analysis. 20 C.F.R. § 404.1520(e).  The claimant has the initial

burden of proof in steps one through four, while the burden shifts to the Commissioner in step

five to show that there are a significant number of jobs in the national economy that the claimant

is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Strack's appeal focuses on step three, relative to the ALJ's finding that Strack was not

disabled because Strack did not meet the criteria for listed impairment 12.05C.  Strack also

makes a global assertion that the ALJ's "findings" were not supported by substantial evidence.

**A.    Whether the ALJ's finding relative to Listed Impairment 12.05C was supported by substantial evidence.**

Strack challenges the ALJ's finding that he did not meet the criteria of Listing 12.05C:

Mental Retardation.

At step 3, the ALJ must determine whether the claimant has any of the listed impairments

enumerated in the Listing of Impairments found in 20 C.F.R. pt. 404, Subpt. P, Appendix 1.  The

Listing of Impairments ("the Listing") describes impairments for each of the major body systems

that the Social Security Administration considers to be severe enough to prevent an individual

from doing any gainful activity. 20 C.F.R. § 404.1525(a).  Thus, when a claimant satisfies the

criteria of a Listing, that person is deemed disabled and is automatically entitled to benefits, regardless of his age, education, or work experience. *Id.* For each Listing, there are objective medical findings and other findings that must be met to satisfy the criteria of that Listing. 20 C.F.R. § 404.1525(c)(2)-(3). However, the plaintiff bears the burden to prove that his impairments meet the requirements of a Listing. *See Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir.1999).

In determining whether a claimant suffers from a listed impairment, the Seventh Circuit requires that the ALJ "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Pope v. Shalala,* 998 F.2d 473, 481 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). Remand may be necessary if an ALJ failed to explicitly refer to a relevant listing and went on to perform a perfunctory analysis of the claimant's limitations. *See Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir. 2004) (finding that although the ALJ never identified by name the listing relevant to the claimant's disability claim, the Court could infer from his written decision that he correctly recognized the applicability of the relevant listing); *Scott v. Barnhart,* 297 F.3d 589, 595-96 (7th Cir. 2002).

Listing 12.05 contains an introductory paragraph with the basic description of the impairment "mental retardation." Listing 12.05 also contains four sets of criteria (A through D). If the claimant satisfies the description in the introductory paragraph *and* any one of the four sets of criteria (A through D), then the claimant meets the Listing and the claimant will be deemed disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Listing 12.05 states:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the

impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; or
>
> B. A valid verbal, performance, or full scale IQ of 59 or less; or
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
>> 1. Marked restriction of activities of daily living; or
>> 2. Marked difficulties in maintaining social functioning; or
>> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

Strack argues that the record evidence establishes that he satisfies the description in the introductory paragraph and the criteria set forth in subsection C.[6] 20 C.F.R. Pt. 404, Subpt. P, App. 1. First, Dr. Von Bargen assessed Strack as having a verbal scale IQ score of 71, a performance scale IQ score of 69, and a resulting full-scale IQ score of 67, which falls within the mental retardation range. Second, Strack argues that his cognitive problems manifested before age 22, as evidenced by his hospitalization at age four or five after being hit by a truck (although beyond this assertion, no further information is provided by Strack), his being a poor student, and his inability to pass the GED. Third, Strack believes that his significant work-related limitations

---

[6] Strack does not argue that his mental condition satisfies the requirements of subsections A, B, or D of Listing 12:05. Relative to subsection A, Strack's testimony establishes that he can care for himself, and examining physicians concluded that Strack could perform simple routine repetitive tasks. Specifically, Dr. Von Bargen concluded that Strack "understood instructions readily," but worked slowly, and he was able to "adequately care for himself and perform routine daily activities"; Dr. Bacchus indicated that Strack could perform simplified duties; and, Dr. Neville concluded that Strack could understand, remember, and carry out simple repetitive instructions. In addition, relative to subsection B, Strack never had a verbal, performance, or full scale IQ score of 59 or less. As to subsection D, no evidence showed that Strack suffered marked limitations in performing activities of daily living, maintaining social functioning, or maintaining concentration, persistence, or pace, and, Strack did not experience episodes of extended decompensation.

of functions are evidenced by the ALJ's RFC determination. Strack contends that the ALJ's finding that he did not meet the Listing, despite his low intelligence scores, was an error. As such, Strack requests that the Court enter a finding of disabled.

The Court cannot agree. Even assuming Strack has met the requirement that he must have an impairment imposing a significant work-related limitation, as evidenced by the numerous limitations noted in the ALJ's RFC finding, the substantial evidence supports the ALJ's determination that Strack did not have a valid IQ score of 60 through 70 and that Strack's mental impairment was not initially manifested prior to age 22.

In making the Listing determination, the ALJ acknowledged Strack's low IQ scores, but stated that he agreed with Dr. Von Bargen's finding that Strack's IQ scores were underestimates of his actual cognitive ability. The ALJ then proceeding to explain why the IQ scores were not valid:

> There is no evidence in the record that [Strack] has been given a diagnosis of mental retardation range. Rather, Dr. Von Bargen felt that the claimant was functioning in the borderline intellectual range. Furthermore, progress notes from the Veteran's Administration indicate that the claimant was felt to be functioning at least in the average range of intellect . . .

Based on this objective medical evidence, the ALJ stated "[t]he undersigned finds no reason to conclude that the claimant is mentally retarded."

In fact, the ALJ was correct in concluding that the record lacks any finding that Strack was mentally retarded. Instead, the record shows that those who discussed Strack's level of functioning indicated that he functioned at a higher level. In 2005, a comprehensive psychiatric evaluation revealed that Strack was functioning with "at least average" intellect. In March 2006, Dr. Von Bargen's psychological evaluation of Strack led him to believe that Strack's IQ scores "may be a slight underestimate of his actual ability" because he was able to complete more

difficult parts of the test after failing easier items. Dr. Von Bargen specifically declined to diagnose him as mentally retarded, but instead said that Strack suffered from BIF.[7] Furthermore, after completing a mental RFC assessment in March 2006, Dr. Neville acknowledged Strack's low IQ scores but agreed with Dr. Von Bargen's findings and observed that BIF was an accurate diagnosis due to Strack's history and adaptive behavior. In July 2006, Dr. Van Bargen did not change Strack's diagnosis of BIF. Also, in July 2006, Dr. Suryawala provisionally diagnosed Strack with Adjustment Disorder, and, Dr. Nerenberg indicated that Strack's intellect was "at least average" and noted that Strack suffered from Adjustment Disorder with depressed mood. And again, in 2008, Strack was said to have an intellect "within the average range," and he was diagnosed by Ms. Richeson and Dr. Suryawala with Adjustment Disorder with depression. Strack never received a diagnosis of mentally retarded and his low IQ scores were specifically addressed as being underestimates of his level of functioning.

However, the ALJ's explanation for discounting the IQ scores, did not rest solely on the medical evidence. Instead, the ALJ also discussed the reasons why Strack's IQ scores were inconsistent with Strack's developmental history, daily activities, and cognitive ability:

> [Strack] has been married several times, he has a driver's license, and he has a young son he is raising. He has a long history of substantial gainful work activity, including a job as a tree cutter, which is semi-skilled work in terms of job complexity. There is no evidence that the claimant was given special accommodations in his work activity or that he has any major adaptive deficits which would signify mental retardation.

> The claimant's mental status examinations are consistent in showing some depression/adjustment disorder problems. It does not appear that there is a

---

[7]The claimant's brief states that Dr. Van Bargen did not state his reasons for concluding why the IQ scores were invalid and accuses Dr. Van Bargen of withholding data because he did not want his conclusions scrutinized [DE 16 at 14]. The Court respectfully rejects claimant's mischaracterization of Dr. Van Bargen's findings, who after evaluating Strack on more than one occasion, explicitly explained in detail the basis for his diagnosis, which included his observations of Strack and the results of Strack's standard assessment measures. Further, other than claimant's bald assertions, there is simply no evidence that the testing measures used were somehow flawed, nor is there evidence which contradicts Dr. Van Bargen's ultimate conclusions for that matter.

definite or conclusive finding of PTSD.  His GAF scores have been 60 or above, at least since the amended alleged disability onset date.  Furthermore, due to his history of frequent failed attempts in getting a GED, it seems reasonable to conclude that the claimant has difficulty in reading, spelling, and math calculations.

The ALJ's discussion properly set forth the record evidence regarding Strack's ability to function in society, and thoroughly explained the circumstances which exemplified Strack's adaptive abilities. *See Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) (recognizing that the ALJ is to include a discussion of reasons for concluding whether or not obtained IQ scores are considered valid and consistent with the individual's developmental history and degree of functional restriction); *Adkins v. Astrue*, 226 Fed.Appx. 600, 605 (7th Cir. 2007) (recognizing that the ALJ properly explained the evidence that cast doubt on the validity of the IQ tests, including contrary evidence of cognitive ability).  Here, the ALJ thoughtfully reflected on the record evidence and explained his reasons for concluding that Strack's IQ scores were not valid measures of Strack's ability.

Although it is true that the ALJ did not explicitly cite Listing 12:05 by name, it is clear that the ALJ conducted the analysis required under Listing 12:05 and repeatedly referenced that his findings were relative to "mental retardation."  Specifically, the ALJ stated, "[t]here is no evidence in the record that he has been given a diagnosis of mental retardation" and "[t]he undersigned finds no reason to conclude that the claimant is mentally retarded." These statements, combined with the detailed findings that the ALJ made regarding Strack's IQ scores and limitations relevant to Listing 12.05C, could only mean that the ALJ considered whether Strack met the Listing for mental retardation.  Moreover, the ALJ's detailed findings make clear that the ALJ considered step three with much more than a "perfunctory analysis" and did not commit a reversible error by failing to specifically cite the Listing that he was considering.

Since the substantial evidence supports the ALJ's conclusion that Strack's IQ score did not satisfy the first prong of Listing 12:05, the Court need not analyze whether Strack showed deficits in adaptive functioning initially manifested during the developmental period. *See Maggard*, 167 F.3d at 380. In any event, the Court notes that the ALJ acknowledged Strack's history of failed attempts to pass the GED, but concluded that he likely suffered from difficulty in reading, spelling, and math, and not mental retardation (as evidenced by 2003 testing records previously identified by the ALJ, along with a lack of any special education records). Finally, the ALJ explicitly dismissed Strack's contention that he had any traumatic brain injury resulting in cognitive difficulties, as all of his brain testing was negative. Moreover, after noting that Strack's GAF scores were all 60 or above since the amended onset date, and after detailing Strack's past work and current ability to carry out daily activities, the ALJ was entitled to conclude that Strack does not suffer from "adaptive deficits which would signify mental retardation." *See Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) (noting that if you cannot cope with the challenges of ordinary everyday life, you are not going to be able to hold down a full-time job).

Here, the ALJ's conclusion that Strack did not meet the Listing's requirements for "mental retardation" is adequately supported by substantial evidence. In fact, it is unlikely that the ALJ's analysis could have been more elaborate.

**B.      Whether the ALJ's findings were supported by substantial evidence.**

Strack next argues that there is substantial evidence that "overwhelmingly supports a finding of disability." [DE 16 at 14]. In support of his position, Strack states that he "has approximately 15 to 23 impairments . . . [and] [w]hen their combined symptoms and the toll of

the multiple medications needed to treat them are considered, it is clear that the Plaintiff cannot maintain regular and continuous employment." [DE 16 at 14-15].

Despite generally alluding to his long list of medical limitations and medications, Strack, by counsel, has not developed an argument for why any side effect from medication or any medical limitation, singly or in combination, supports his position that the ALJ erred in denying him benefits. "[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver." *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010); *see Johnson v. Apfel*, 189 F.3d 561, 562 (7th Cir. 1999) ("we require that an issue to be preserved must be developed and not merely mentioned"). Moreover, as the Commissioner points out, Strack does not object to the ALJ's credibility finding, he does not specifically challenge the RFC finding or the hypothetical questions posed by the ALJ to the VE, and he does not object to the ALJ's reliance on the VE's testimony. In fact, Strack's counsel does not present any argument supported by legal authority and citations to the record, and his generalized assertion of error is not sufficient to challenge an adverse ruling. *See Anderson v. Hardman*, 241 F.3d 544 (7th Cir. 2001) (discussing that the rules equally apply to pro se litigants). As a result, Strack waives the arguments that he does not make concerning the ALJ's findings. Moreover, even if Strack had not waived these contentions, they all would fail.

*1. ALJ's Credibility Determination*

Because the ALJ is in the best position to observe witnesses, an ALJ's credibility determination will not be upset on appeal so long as it finds some support in the record and is not patently wrong. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). Indeed, "[o]nly if the trier of facts grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th

Cir. 2006).  However, as a bottom line, SSR 96-7p requires an ALJ to consider the entire case record and articulate specific reasons to support his credibility finding. *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003).  Further, while an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence, an ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004); SSR 96-7p.

The process for evaluating a claimant's symptoms is organized around two major steps. First, the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms.  20 C.F.R. § 416.929(a)-(b).  In Strack's case, the ALJ found that Strack's medically determinable impairments could reasonably be expected to cause Strack's alleged symptoms (Tr. 33).

Second, after the first step is satisfied by the claimant, the ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. 20 C.F.R. § 416.929(a).  While an ALJ may not reject subjective complaints of pain solely because they are not fully supported by medical testimony, the ALJ may consider that as probative of the claimant's credibility. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); SSR 96-7p.  The regulations identify seven examples of the kind of evidence that the ALJ considers, in addition to objective medical evidence, when assessing the credibility of an individual's statements:

> (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the

individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c); SSR 96-70. The ALJ need not mechanically recite findings on each factor, but must give specific reasons for the weight given to the individual's statements. *Ware v. Apfel,* 2000 WL 1707942 (S.D. Ind. 2000); SSR 96-7p.

Reviewing the ALJ's opinion, the Court concludes that the ALJ adequately considered the evidence of record and gave specific reasons for the weight he gave to the statements made by Strack and his wife (who completed records in support of Strack's application for benefits). First, the ALJ was careful to summarize and consider all of the statements. Then, after concluding that theses statements were not entirely credible, as they concerned the intensity, persistence, and limiting effects of Strack's symptoms, the ALJ detailed the significant amount of record evidence which supported his conclusion.

Specifically, the ALJ summarized Strack's voluminous medical records and the treatment that Strack sought from various medical providers for his many identified mental and physical problems. The ALJ noted that Strack's treatment did not include any surgeries for his multiple musculoskeletal complaints, and that Strack was unwilling to take psychotropic drugs until June 2008. The ALJ discussed the various professional opinions issued throughout the course of Strack's treatment, including the fact that no findings supported Strack's having any neurological deficits.

The ALJ discussed the location, frequency and intensity of Strack's various problems, as reflected in the various documented functional capacity assessments and resulting GAF scores assigned to Strack. The ALJ noted that in 2008, Strack reported that he had not passed out in the last year, but he did have dizzy spells. The ALJ discussed Strack's daily activities, which

included his walking a lot, or at least enough to wear out his shoes, despite Strack's testimony to the contrary. The ALJ pointed out that Strack did stand three times during the course of the hearing, but he also pointed out that Strack did not use an assistive device to stand or walk. The ALJ identified the inconsistencies between Strack and his wife's accounts of Strack's limitations. Moreover, the ALJ explained that Strack's VA records were "replete with references to the claimant being preoccupied with obtaining disability benefits." These explanations all support the ALJ's opinion that neither Strack, nor his wife, were completely credible.

It is possible that a different conclusion might be warranted if the Court considered only Strack's subjective complaints, his wife's assertions, and Dr. Goldburg's single conclusory treatment note from November 2007 that Strack was disabled. But in this regard, it must be remembered that the record contains objective medical findings and an extensive summary of Strack's treatment, present and past daily activities, and his work history, etc., which are not commensurate with Strack's subjective ailments. And while this Court believes that the ALJ's opinion is sound, even if reasonable minds could differ about the disability status of Strack, the Court must affirm the Commissioner's decision as long as it is adequately supported-as it is here. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Given the ALJ's extensive discussion of the record evidence, the Court finds that the ALJ's credibility determination, along with his determination concerning the extent to which Strack's symptoms limited his ability to do basic work activities, is substantially supported by the evidence in the record. Accordingly, the ALJ did not commit error in this respect.

*2. ALJ's Residual Functional Capacity Determination*

The ALJ must determine the claimant's RFC before performing steps four or five. *Young*, 362 F.3d at 1000; 20 C.F.R. § 404.1520; SSR 96-8p. RFC is an assessment of the work-related

activities a claimant is able to perform on a regular and continued basis despite the limitations imposed by an impairment or combination of impairments. *Id.* This finding must be assessed based on all the relevant evidence in the record, 20 C.F.R. § 404.1545(a)(1), must consider all medically determinable impairments even if not considered "severe," 20 C.F.R. § 404.1545(a)(2), and must be supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000).

The ALJ has final responsibility for deciding a claimant's RFC, which is a legal decision rather than a medical one. *See* 20 C.F.R. §§ 404.1546(c), 404.1527(e). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Further, an ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Nevertheless, an ALJ need not provide a written evaluation of every piece of testimony and evidence. *Golembiewski*, 322 F.3d at 917. Instead, an ALJ need only minimally articulate his justification for accepting or rejecting specific evidence of disability. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).

The ALJ recognized that Strack had several severe impairments, but concluded that, despite those impairments, Strack had the RFC to:

> [P]erform "light" work as defined in 20 CFR 404.1567(b) and 416.967(b) (i.e. lift/carry/push/pull 20 pounds occasionally and 10 pounds frequently, and sit/stand/walk at least 6 hours of an 8 hour workday), except that he needs to have a sit/stand option (where he can occasionally change positions throughout the eight-hour workday but can still remain attentive to the task at hand). He is only occasionally able to climb ramps and stairs, stoop, kneel, balance, and crouch and he is not able to climb ladders, ropes, or scaffolds at all. He cannot work in environments where he would have exposure to bright lights or loud

noises or where he would have concentrated exposure to extreme heat or humidity. He also needs to avoid hazards (such as working at unprotected heights or around dangerous moving machinery). In addition, the claimant is limited to simple, routine, repetitive tasks that do not involve a fast pace, strict production requirements, or tasks where reading, spelling, and math calculations are an essential part of the job.

The ALJ noted that his RFC assessment incorporated both, Strack's physical and mental limitations, and explained that his RFC findings were consistent with, or more restrictive than, the record reflects.

In fact, a review of the state agency records, which the ALJ referred to, shows that in April 2006, Dr. Sands reviewed Strack's file and determined that Strack did not have a severe impairment, and Dr. Brill also reviewed the file in July 2006 and agreed with Dr. Sands' assessment. Also in July 2006, Dr. Kladder reviewed the file and affirmed Dr. Neville's finding (who conducted a mental RFC assessment) and found that Strack had the capacity to carry out simple repetitive tasks in a competitive setting. The review conducted by the State Agency in February 2008, also resulted in an agreement with Strack's previous mental and physical diagnoses.

The ALJ also noted that his RFC assessment was consistent with the RFC evaluation completed in March 2006, by Dr. Bacchus, who physically examined Strack and reviewed Strack's medical history and the previous observations made by his treating doctors. Dr. Bacchus determined that Strack could "perform general, simplified duties, standing 5-6 hours in an 8 hour day."

Importantly, the ALJ also identified the results of Strack's January 2006 functional capacity evaluation conducted by a physical therapist, which indicated that Strack may be further limited in his physical abilities. Specifically, the physical therapist reported that Strack had an inability to kneel, squat, crawl, and reach, and that Strack could only sit, stand, and walk for

twenty minutes at a time. Yet, the same evaluation noted that Strack was less restricted in his ability to climb stairs and balance. The ALJ explained that he fully considered the results of the therapist's evaluation, but noted that the opinion was not given by a physician and that the therapist's findings were inconsistent with the objective medical evidence and the medical opinions rendered relative to Strack's physical condition, as identified by the ALJ.

Regarding the ALJ's assessment of Strack's mental abilities, the ALJ explicitly found, as did Dr. Neville, that Strack was only mildly limited in his activities of daily living and maintaining social functioning, and moderately limited in maintaining concentration, persistence, or pace. The ALJ then explained that while Strack would have "some moderate limitations in sustaining concentration, persistence, or pace" it was only to the extent that Strack "likely would not be capable of completing complex or detailed tasks, but could successfully perform unskilled, simple, routine work tasks." Thus, the ALJ limited Strack to performing "simple, routine, repetitive tasks, that do not involve a fast pace, strict production requirements, or tasks where reading, spelling, and math calculations, are an essential part of the job." As the ALJ acknowledged, the additional restrictions included in his RFC determination relative to pace and production requirements were to accommodate Strack's mental limitations, and were consistent with, and even more restrictive than, the opinions rendered by the physicians of record.

Specifically, the ALJ's opinion relative to Strack's mental limitations was consistent with Dr. Von Bargen's determination that Strack would perform best in unskilled or semiskilled occupations involving relatively repetitive tasks and Dr. Bacchus's opinion that Strack could perform general, simplified duties. In addition, the ALJ's RFC finding was more restrictive than Dr. Neville's opinion that Strack had the capacity to carry out simple repetitive tasks in a competitive setting. After the ALJ discussed Strack's mental conditions and thoroughly

explained the basis for his RFC assessment, the ALJ concluded that there was no reason to give more mental restrictions than indicated in his RFC assessment.

Also of note, in determining Strack's RFC, the ALJ further relied on Strack's pleasant, cooperative, and articulate accounting of his impairments at the hearing, and the ALJ explained why there was no reason to conclude that Strack was mentally retarded or further limited in his ability to perform mostly simple, unskilled work, as previously detailed.

In sum, the ALJ's thorough comparative analysis of the opinions rendered by the numerous treating professionals and examining physicians, the fact that the resulting RFC finding was more restrictive than the findings made by the physicians of record, and the fact that Strack does not identify any impairment or combination of impairments which the ALJ failed to account for in making the RFC determination, allow this Court to find that Strack's RFC determination was more than adequately supported.

*3. ALJ's Hypothetical Questions Posed to the VE and Reliance on the VE's testimony*

If the claimant cannot perform his past relevant work, as is the case with Strack, then the analysis at Step 5 focuses on whether the claimant can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v) and (g). At Step 5, the ALJ considers numerous factors, such as: the claimant's RFC, age, education, and work experience, to see if the claimant can make an adjustment to other work. *Id*. If a claimant can make an adjustment to other work, then the ALJ will find that the claimant is not disabled. *Id*. However, if the claimant cannot make an adjustment to other work, then the ALJ will find that the claimant is disabled. *Id*.

At this step, the ALJ often utilizes the testimony of a VE, proffering hypothetical questions consistent with the ALJ's RFC findings. To the extent that the ALJ relies on the testimony from a VE, the hypothetical question posed to the expert must incorporate all relevant

limitations from which the claimant suffers in order to accurately gauge how many jobs are available to the claimant in the national economy. *Young*, 362 F.3d at 1003. In addition, when posing hypothetical's to a VE, the regulations require that the ALJ consider the combined effects of a claimant's impairments. 20 C.F.R. § 404.1523.

Further, when a VE provides testimony about the requirements of a specific occupation, the ALJ has an affirmative duty to ask whether the testimony conflicts with the Dictionary of Occupational Titles ("DOT"). *Prochaska*, 454 F.3d at 735; *Hofer v. Astrue*, 588 F.Supp.2d 952, 965-66 (W.D. Wis. 2008). When there is an apparent conflict between the VE's testimony and the information provided in the DOT, the ALJ has an affirmative responsibility to obtain a reasonable explanation for the apparent conflict. *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008); *Hofer*, 588 F.Supp.2d at 966; SSR 00-4p. However, where claimant's counsel did not identify a conflict at the hearing, the claimant must show that the conflict was obvious enough that the ALJ should have picked up on it without any assistance. *Overman*, 546 F.3d at 462-63; *Hofer*, 588 F.Supp.2d at 966-67.

In the present case, the ALJ examined all of Strack's limitations and quantified their effects. The ALJ then posed a hypothetical to the VE which incorporated all of Strack's specific limitations, including both his physical and mental conditions, as set forth in the ALJ's RFC finding. Strack does not suggest that the hypothetical included a task that he could not perform based on an identified physical or mental limitation from which he suffers. Therefore, the hypothetical question posed to the VE was properly submitted since it was based on an appropriate RFC determination which was sufficiently supported by the ALJ's analysis of the record evidence. Furthermore, the ALJ went one step further and posed a hypothetical with the same limitations as the first, but with the work level reduced from light to sedentary. This more

restrictive hypothetical resulted in a number of jobs still available.  The ALJ properly noted that while the sit/stand option was not recognized by the DOT, he included this restriction in the hypotheticals posed to the VE, who then testified to the availability of work in the national economy which Strack could perform.

Ultimately, the ALJ determined that based on the VE's testimony, while Strack could not perform any of his past relevant work, he could perform a significant number of jobs available in the economy, including bagger of garments, folder of laundry, inspector, and hand packager.

Keeping in mind that a reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh evidence, but that the ALJ must build a logical bridge from the evidence to his conclusion, the Court finds that the ALJ more than adequately considered the record evidence, posed hypothetical questions to the VE which appropriately included Strack's limitations, and was not in error in relying on the VE's testimony.  Because Strack is capable of performing work that exists in significant numbers in the national economy, he is not disabled, 20 C.F.R. § 404.1520(g), and the Court finds that the ALJ's findings are sufficiently articulated and supported by substantial evidence.

## V.  CONCLUSION

The ALJ's determination that Strack did not meet Listing 12.05 for mental retardation was supported by substantial evidence.  The Court also rejects the global assertion that the ALJ's opinion was deficient.  In fact, the ALJ's analysis is thorough and complete.  Accordingly, this Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g).  The clerk is instructed to term the case and enter judgment in favor of the Commissioner.

SO ORDERED.

ENTERED: September 13, 2011

_____/s/ JON E. DEGUILIO_____.
Judge
United States District Court